IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| IN RE NUTRISYSTEM, INC. | : | CIVIL ACTION |
| DERIVATIVE LITIGATION | : | |
| | : | NO. 07-4565 |
| This document relates to: | : | |
| All Actions | : | MASTER FILE |


MEMORANDUM

McLaughlin, J.                                          October 26, 2009


        This is a derivative action involving NutriSystem, Inc.
("NutriSystem"), a publicly-traded company that sells weight
management products.  NutriSystem's share price fell markedly on
October 3, 2007, when the company announced a lowered earnings
forecast as a result of competition from Alli, an over-the-
counter anti-obesity drug produced by GlaxoSmithKline ("GSK") and
released in June 2007.  Several lawsuits were filed in this
district within a month of this drop in share price, each
alleging, among other claims, that NutriSystem and its management
made false and misleading statements about the effect Alli was
having on the company's sales.

        Eight putative securities class actions were
consolidated as In re NutriSystem, Inc. Securities Litigation,
07-4215.  The Court granted the defendants' motion to dismiss the
consolidated class complaint in that action on August 31, 2009.
Two derivative actions on NutriSystem's behalf were filed in this
district and consolidated in the above-captioned action.  The

Court now considers the defendants' motion to dismiss the consolidated derivative complaint.[1]

In the consolidated derivative complaint, plaintiff James Fetzner, a NutriSystem shareholder, seeks to bring claims on NutriSystem's behalf against ten of its officers and directors.[2]  The defendants are four executives of the company, Chief Executive Officer ("CEO") Michael J. Hagan, Chief Financial Officer ("CFO") James D. Brown, Chief Marketing Officer ("CMO") Thomas F. Connerty, and Chief Information Officer ("CIO") Bruce Blair, and six members of its board of directors, Ian J. Berg, Robert F. Bernstock, Michael A. DiPiano, Warren V. Musser, Brian P. Tierney, and Stephen T. Zarilli.  CEO Hagan is also a member of the board of directors.

The defendants are alleged to have committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and to be liable under Delaware law for breach of their fiduciary duties, waste, and unjust enrichment.  The

---

[1]    The two derivative actions are <u>Esau v. Hagan</u>, et al., No. 07-4565 and <u>Jones v. Hagan</u>, et al., No. 07-5193.  The consolidation order set Case No. 07-4565 as the lead case and allowed for the filing of a consolidated complaint.  The parties stipulated to the withdrawal of the two existing plaintiffs and their replacement by a new plaintiff, James Fetzner, who filed a verified shareholder derivative complaint on March 18, 2008.

[2]    NutriSystem, itself, is also named as a nominal defendant.

plaintiff has not made a demand on NutriSystem's board or its shareholders, but contends that any demand on the board would be futile and any demand on the shareholders would be impractical.

The defendants move to dismiss the consolidated derivative complaint on two grounds. They argue that the plaintiff has failed to adequately allege that making a demand on NutriSystem's board would be futile because the complaint does not contain sufficient particularized factual allegations to overcome the presumption that the board would act impartially on the demand. In the alternative, the defendants argue that the complaint fails to state a claim upon which relief can be granted.

The Court finds that the plaintiff has not carried his burden of pleading facts sufficient to show that his failure to make a demand on NutriSystem's board is excused on grounds of futility. The derivative complaint will therefore be dismissed. Because the Court has found that demand is not excused, the Court will not address whether the plaintiff's complaint should also be dismissed for failure to state a claim.

I.   <u>Allegations of the Complaint and Incorporated Documents</u>[3]

    A.   <u>The Parties</u>

        Plaintiff James Fetzner is an individual who owned NutriSystem common stock during the events alleged in the complaint.  NutriSystem is a corporation organized under the laws of Delaware that sells weight management and fitness products.  Compl. ¶¶ 9-10.

        Since December 2002, NutriSystem's Chairman of the board and CEO has been defendant Hagan.  Hagan was also NutriSystem's President from July 2006 to September 2007.  Defendant Connerty has been NutriSystem's CMO since November 2004 and its Executive Vice President for Program Development since July 2006.  Defendant Brown was NutriSystem's CFO from December 1999 until he resigned in August of 2007; he was also the company's Treasurer, Secretary, and an Executive Vice President during the relevant period through August 2007.  Defendant Blair has been NutriSystem's CIO and Senior Vice President, Operations since April 2005.  These four defendants will be referred to collectively as the "management defendants."  Compl. ¶¶ 10-14.

        Defendants Berg, Tierney, and Musser and Zarilli have been members of the NutriSystem board of directors since February

---

[3]    In deciding the defendants' motion to dismiss, the Court may consider the complaint in its entirety, including attached exhibits, as well as documents incorporated into the complaint by reference or matters of which a court may take judicial notice.  <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007).

2003.  Defendant DiPiano has been a NutriSystem director since December 2002; defendant Musser has been a director since December 2003, and defendant Bernstock has been a director since December 2005.  These six defendants will be referred to collectively as the "director defendants."  Compl. ¶¶ 15-20. Another member of the board of directors, Michael F. Devine, III, was originally named as a defendant in this action, but was voluntarily dismissed by the plaintiff in April 2008.

During the relevant time period, up through April 7, 2008, the members of NutriSystem's board of directors were Hagan, the six director defendants, and non-defendant Devine.  The audit committee of NutriSystem's board of directors comprised director defendants Berg, DiPiano, and Zerilli and non-defendant Devine. The audit committee was responsible for reviewing NutriSystem's press releases and earnings guidance provided to the public. Defendants DiPiano and Tierney were members of the board's compensation committee, which had the authority to review and approve the salary, bonus, and equity compensation of NutriSystem officers, including CEO Hagan.  Compl. ¶¶ 15-20, 78.

After the operative complaint was filed in March 2008, NutriSystem announced on April 8, 2008, that Hagan would be replaced as CEO by Joseph Redling.  Redling joined the board of directors on April 7, 2008.  At least up through the briefing on the motion to dismiss, Hagan has remained on the board of

directors as well, changing its membership from eight to nine members.  Apr. 8, 2008, Press Release, Def. Ex. 9.

      B.   <u>The Development of Alli, a NutriSystem Competitor</u>

      The drug that GSK now markets as Alli has the formulary name of Orlistat and was previously marketed as the prescription drug Xenical.  The Food and Drug Administration ("FDA") approved the drug for prescription use in 1999.  GSK subsequently purchased the rights to the drug and sought to have it approved for sale over-the-counter.  Compl. ¶ 35.

      GSK's efforts to have the drug sold over-the-counter were known to NutriSystem.  In November 2006, NutriSystem sponsored a presentation at an investor conference by Dr. Gary Foster, an expert in obesity research.  The presentation concerned trends in the field of obesity treatment.  Dr. Foster stated at the presentation that Alli was the safest weight loss medication ever studied and that it was "certain to be approved." Dr. Foster said that he expected the public would respond with a "surge" of interest and that Alli could become a "blockbuster," although he also said that it might not.  Dr. Foster said that he thought the market would be able to tell within the first six months what would happen with Alli's sales.  Compl. ¶¶ 44-46.

      In January 2006, an FDA advisory committee recommended that the drug be approved for over-the-counter use, a significant step toward final approval.  A January 18, 2006, article in the

-6-

New York Times discussed the drug and its prospects for approval
for use without a prescription.  In October 2006, GSK reported in
forms filed with the Securities and Exchange Commission ("SEC")
that it had submitted its final safety and efficacy data to the
FDA and that it expected to launch the drug in the first half of
2007.  On February 7, 2007, the FDA announced that it had
approved Alli for over-the-counter use in the United States.  In
a USA Today article in May 2007, GSK was quoted as estimating
that five to six million Americans a year would use the drug for
sales of at least $1.5 billion a year.  Compl. ¶¶ 37-40.

        GSK introduced Alli to the market on June 13, 2007.
The introduction was accompanied by significant media coverage.
Sales of Alli were very high.  In October 2007, GSK reported
sales of more than two-million starter kits for Alli in the four
months since its introduction.  Compl. ¶¶ 40-41.


        C    NutriSystem's Public Statements Before and After Alli's
             Introduction from February 2007 through February 2008

        On February 14, 2007, one week after Glaxo announced
the FDA's approval of Alli for over-the-counter sale, NutriSystem
issued a press release reporting fourth quarter 2006 results and
providing first quarter and full-year guidance for 2007.  The
press release stated that the first quarter of 2007 had "started
off strong with growth across all of our market statements" and
that "key financial metrics such as customer acquisition costs

-7-

have improved over the course of the quarter." The company predicted that 2007 first-quarter revenue would be between $205 million and $215 million, "an increase of at least 40% year-over-year," and that earnings would be between $0.88 and $0.92 per diluted share. The company estimated that full-year revenue would be between $720 million and $740 million. Compl. ¶ 47.

On April 25, 2007, NutriSystem issued a press release announcing first quarter results and providing guidance for the remainder of 2007. The company reported first-quarter revenues of $238,360,000 and net income of $37 million or $1.04 per diluted share. The company estimated that second-quarter revenues would increase 43% year-over-year to between $190 million and $200 million and that it would add at least 210,000 new Direct channel customers in that period. The company raised its estimate of 2007 full year revenues to between $790 million and $805 million.

In the April 25, 2007, press release CFO Brown is quoted as saying that the company's "economics are strong and getting stronger." CEO Hagan is quoted as saying that "2007 is shaping up to be a very good year for us" and that the company's strategy is to "focus on three areas: profitable new customer growth across all market segments – women, men, and seniors; continue to improve retention and reactivation efforts; and invest in product areas such as our new 2008 weight loss program

that advance customer health while growing the lifelong value of each customer."  Compl. ¶ 48.

On July 24, 2007, over a month after Alli's introduction to the market on June 13, 2007, NutriSystem issued a press release announcing its second quarter financial results, third quarter estimates, and full-year guidance.  The company reported revenues of $213,556,000 for the second quarter and diluted earnings per share of $0.96, an increase of 61% and 81% over those figures for the second quarter of 2006.  CEO Hagan was quoted as saying that "[t]he quarter was a very good one and we were pleased with the solid growth in our core women's market and continued strength in revenue coming from our ex-customers."  Id. In the press release, NutriSystem estimated third quarter revenues of between $200 million and $208 million, and raised its full year 2007 revenue guidance to between $810 million and $820 million.  Compl. ¶ 49.

A conference call with securities analysts was held on July 24, 2007, to discuss the company's results and earning guidance.   In that call, CEO Hagan noted that the company was seeing "some slight softness in demand starting in late June and carrying into early July."  Id.  Hagan added that the company "believe[d] the launch of a new over-the-counter weight loss pill with significant PR and media behind it has had an effect, and based on information we have this is fully reflected in our guidance for the remainder of the year."  Transcript of July 24,

-9-

2007, NutriSystem Q2 2007 Earnings Call, Ex. 6 to Mot. to

Dismiss.  In response to a question from an analyst, Hagan stated

that

> for the first time we did see some slight
> softening of demand as we entered the second
> half of June and not so coincidentally we
> believe that it might be related to the
> launch of a new over-the-counter drug from
> GSK and the big PR and media blitz
> surrounding it.[4]

> . . . we believe that -- what you often see
> in cases such as this, you get a lot of pent-
> up demand because of the huge amount of hype
> around this product.  But if consumers either
> don't lose the weight or not fast enough or
> don't like the side effects then we believe
> it is just a temporary type of thing and this
> is what we believe.

Id.

On October 3, 2007, NutriSystem issued a press release

announcing preliminary third quarter 2007 results and revising

guidance for the remainder of 2007.  The release stated that the

company was now forecasting earnings for the third quarter of

only $188 million, below the previously forecast range of $200 to

$208 million.  NutriSystem also stated that its number of new

customers in the quarter was expected to be only 218,000, a 7%

decline from the third quarter of the prior year.  The press

---

[4]    The complaint misconstrues CEO Hagan's statement as
opining "that the 'slight softening of demand' was believed to
'coincidentally' be related to the launch of a new over-the-
counter weight loss pill."  Compl. ¶ 50.  The transcript of the
conference call makes clear that CEO Hagan said that the
relationship between the softening of demand and the launch of
Alli was not coincidental.

release quoted CEO Hagan as saying that, although the results for
the third quarter did not meet expectations, the company
continued to be "satisfied" with its performance:

> We continue to be satisfied with our success
> in reactivating former customers, but our
> performance with new customers we believe was
> affected by shorter[-]term competitive
> pressures which caused our marketing dollars
> to become less efficient, resulting in fewer
> new Direct Business customers than
> anticipated and customer acquisition costs to
> be higher than anticipated.

Id. ¶ 51.

On October 24, 2007, the company issued a press release
announcing financial results for the third quarter, confirming
most of the guidance provided on October 3rd.  The company
announced third-quarter earnings of $188 million and revised its
yearly earnings forecast to between $770 million to $776 million,
over $30 million less than the July 24, 2007, estimate.  The
release stated that NutriSystem expected fourth quarter revenue
to be flat on a year-to-year basis and the number of new
customers in the fourth quarter to be down 20% as compared to a
year earlier.  CEO Hagan was quoted in the release as saying
that, although the company "continue[d] to feel positive about
[its] business and its long-term strength," the third-quarter
results did not "meet our growth expectations."  Hagan conceded
in the release that "competitive pressures from new entrants in
the weight loss market had a larger effect on our marketing

efficiency than anticipated" and that growth in new customers was
off 11% from the guidance provided in July 2007.  Id. at 52.

On February 19, 2008, NutriSystem had a conference call
with analysts to discuss the company's 2007 results.
Participating in the call were CEO Hagan and non-defendants David
Clark, who had replaced defendant Brown as CFO in August 2007,
and Joseph Redling, who would replace Hagan as CEO in April 2008.
CEO Hagan announced full year 2007 revenues of $777 million and
fourth quarter 2007 revenues of $137 million, which increased 3%
over the previous year.  Hagan also announced an 18% decline in
new customers in the fourth quarter.  Id.; Compl. ¶ 59.  CFO
Clark announced that the company would be changing the metrics it
used to assess its long-term profitability, moving from an
emphasis on customer acquisition costs to "gross margins,
marketing as a percentage of sales and adjusted EBITDA margins."
Clark explained:

> As you have heard and will hear our
> management is focusing on operating our
> company as a recurring revenue model that
> focuses not just on first-time customers but
> on generating maximum profitability over
> their time with us.  Consequently, we will be
> directing increasing portions of our
> marketing and promotional spending toward
> extending length of stay and increasing the
> instance of reactivations.
>
> Accordingly we will measure our success on
> adjusted EBITDA [earnings before income,
> taxes, depreciation, and amortization]
> generation and the consequent margin as
> compared to our revenue.  And so consistent
> with subscriber-based businesses [sic] and we

are also consistent with our peers,
commencing in the first quarter we will move
our focus towards gross margins, marketing as
a percentage of sales, and adjusted EBITDA
margins.  And you will see us move away from
CAC, revenue per customer and other new
customer focused metrics.  While continuing
to use these tactical metrics to make day-to-
day operating decisions, we will have our
strategic focus on long-term profitability.

Compl. ¶ 53.


D.   <u>Alleged Insider Selling</u>

The plaintiff alleges that six of the defendants sold

NutriSystem shares in 2007.  These sellers are the four

management defendants -- Hagan, Brown, Connerty, and Blair – and

two of the director defendants -- Berg and Tierney.  The total

amount sold by these defendants was 305,179 shares for gross

proceeds of $19.5 million.  Compl. ¶¶ 67, 75

The vast majority of these sales occurred between April

and June 2007, before the June 15, 2007 introduction of Alli.

CIO Blair sold shares worth $2,581,319 on May 2, 2007.  CEO Hagan

sold shares worth $4,013,644 on June 1 and 4, 2007.  CMO Connerty

sold shares worth $7,818,657 on April 4, 5, and 26; May 1 and 25;

and June 1, 2007.  CFO Brown sold shares worth $2,942,380 on May

10, June 11, July 10, and September 10, 2007.  Director Tierney

sold $987,440 worth of shares on June 8, 2007, and director Berg

sold $1,127,840 worth of shares on July 2, 2007.  Compl. ¶¶ 67-

68.

The complaint describes Brown's September 10, 2007, sale as particularly suspicious.  Defendant Brown had retired as CFO of the company in August 2007.  On September 10, 2007, he sold $687,120.  A week and a half later, a Citigroup analyst, citing short-term competition from Alli, lowered his price target for the stock from $90 to $81 dollars per share.  Upon this news, NutriSystem's shares dropped 12% to $50.08 per share.  Compl. ¶¶ 69-70.

E   NutriSystem's Stock Buy-back

In 2006 and 2007, NutriSystem's board of directors authorized the company to buy back its own shares.  Three buy-backs were authorized permitting a total of $350 million of the company's shares to be purchased, but the company only purchased $165,145,000 pursuant to these authorizations.

In August 2006, the board authorised a buy-back of up to $50 million of the company's shares.  Over the next six months, the company purchased 900,000 shares at an average price per share of $50.59.  This amounts to a re-purchase of approximately $45,531,000 worth of shares.  Compl. ¶ 61.

On February 14, 2007, the board of directors authorized a second buy-back of up to $200 million of NutriSystem shares. Over the next eight months, the company purchased over 2 million NutriSystem shares at an average price per share of $48.60, for

an approximate purchase of $97,200,000 worth of shares.  Compl.
¶ 62.

On October 3, 2007, the board of directors authorized a
third buy-back of up to $100 million worth of shares.  Over the
next three months, the company purchased 800,000 shares at an
average price per share of $30.50, which amounts to only
$24,400,000 worth of shares.  Compl. ¶ 63; Def. Ex. 7.

These buy-backs were made at an average price of
approximately $46.00 per share.  This price is significantly
higher than the approximately $13.00 per share at which
NutriSystem was trading at the time the consolidated complaint
was filed on March 14, 2008.  Compl. ¶ 64.


        F    Alleged Harm to the Company from the Defendants'
             Actions

The complaint alleges generally that the defendants had
control and authority over NutriSystem, including over the
contents of its public statements.  Each defendant is alleged to
have a fiduciary duty to the company to act in the best interest
of its shareholders.  Each defendant is also alleged to have had
possession of material non-public information about the company.
All of the defendants are generally alleged to be agents of each
other, to have conspired together, and to have aided and abetted
each other's actions.  Compl. ¶¶ 22-28.

The complaint alleges that the defendants allowed NutriSystem to make public statements about its growth prospects that were misleading and deceptive.  The complaint alleges that the defendants either knew or should have known that, at the time these statements were made, 1) NutriSystem was signing up materially fewer new customers and not performing according to internal expectations; 2) NutriSystem's cost of acquiring new customers was increasing significantly;  3) NutriSystem's performance was being negatively affected by competition from other weight loss products; and 4) as a result, NutriSystem was not experiencing solid growth or improving margins.  Compl. ¶¶ 2, 54.

When these statements were corrected, NutriSystem experienced a large decline in its capitalization, with its share price falling from $63.77 in January 2007 to $13.00 at the time the complaint was filed in March 2008.  The complaint contends this decline was in part a result of the harm to NutriSystem's corporate image and good will caused by the misleading statements.  Compl. ¶¶ 55, 59.

NutriSystem is also alleged to have been harmed because the defendants allowed the company to repurchase shares during this period at a price that was inflated by the misleading statements.  At the same time, those defendants who sold shares are alleged to have improperly profited by selling at a time when they knew that the shares were overvalued because of the

misleading statements.  The complaint also alleges that the defendants actions have subjected both themselves and the company to the prospect of expensive litigation.  Compl. ¶¶ 2-3, 57, 58, 65, 67.

G.   Allegations Concerning Futility of Demand

The complaint concedes that the plaintiff has not made a demand on NutriSystem's board, but contends that a demand would be futile.  At the time of the filing of both the original and the consolidated amended complaints, the members of the board of Nutrisystem were defendants Berg, Bernstock, DiPiano, Musser, Tierney, Zarilli, and Hagan, and former defendant Devine.

The complaint contends that a majority of the board had an interest in the litigation or faced a substantial likelihood of liability for the actions at issue.  Defendants Hagan, Berg and Tierney are alleged to have sold stock while in possession of material non-public information and therefore to be both interested directors and in breach of their fiduciary duties. Defendants Berg, Devine, DiPiano, and Zarilli, who were on the board's audit committee and responsible for reviewing and approving the company's allegedly misleading press releases, are alleged to face a substantial likelihood of liability for those allegedly misleading releases.  Defendant Hagan is alleged to have received substantial compensation ($497,772 in 2006) and to therefore lack independence from those board members who make up

-17-

the compensation committee responsible for his pay.  Compl. ¶¶ 75-78.

The complaint contends that making a demand on NutriSystem's shareholders is excused on grounds of impracticability because NutriSystem, with over 34 million shares outstanding, has thousands of shareholders whose identity is not known to the plaintiff.  Compl. ¶ 81.

II.  <u>Analysis</u>

The defendants have moved to dismiss on two grounds: that the complaint does not adequately establish that making a demand on NutriSystem's board would be futile and that the complaint fails to state a claim upon which relief can be granted.  The Court finds that the plaintiff has failed to establish futility of demand and will dismiss the complaint.  The Court will not address whether the complaint states a claim.

A.  <u>Legal Standard for Establishing Demand Futility</u>

In a derivative suit, a shareholder sues on behalf of a corporation to enforce a corporate cause of action against officers, directors, or third parties.  <u>Kamen v. Kemper Fin. Servs.</u>, 500 U.S. 90, 95-96 (1991); <u>Aronson v. Lewis</u>, 473 A.2d 805, 811 (Del. 1984), <u>overruled in non-pertinent part by Brehm v. Eisner</u>, 746 A.2d 244 (Del. 2000).  To prevent abuse of this form of action and to limit its interference with the managerial

-18-

freedom of directors, courts require as a precondition for filing a derivative suit that the shareholder demonstrate "'that the corporation itself had refused to proceed after a suitable demand, unless excused by extraordinary conditions.'" Kamen, 500 U.S. at 96 (quoting Ross v. Bernhard, 396 U.S. 531, 534 (1991)); see also Aronson, 473 A.2d at 811-12.  One such extraordinary condition excusing demand is when demand would be futile. Aronson at 812.

Under the Federal Rules of Civil Procedure, a derivative complaint must plead any excuse for not making a demand with particularity:

> [A derivative complaint] must . . . (3) state
> with particularity:  (A) any effort by the
> plaintiff to obtain the desired action from
> the directors or comparable authority and, if
> necessary, from the shareholders or members;
> and (B) the reasons for not obtaining the
> action or not making the effort.

Fed. R. Civ. P. 23.1(b).  When a plaintiff's derivative action involves state law claims, federal courts must apply the federal procedural requirement of particularized pleading, but apply state substantive law to determine whether the facts demonstrate that demand would have been futile and can be excused.  Kanter v. Barella, 489 F.3d  170, 176 (3d Cir. 2007).  The parties agree that the governing state law here is that of Delaware, the state of NutriSystem's incorporation.

Delaware law applies two different tests for demand futility, named for the two decisions that first announced them:

Aronson and Rales.  Wood v. Baum, 953 A.2d 136, 140 (Del. 2008).
The Aronson test applies when a derivative suit challenges a
decision by the directors.  In such a case, demand will be
excused on futility grounds if, "under the particularized facts
alleged, a reasonable doubt is created that: (1) the directors
are disinterested and independent and (2) the challenged
transaction was otherwise the product of a valid exercise of
business judgment."  Aronson, 473 A.2d at 814.  If either prong
of the Aronson test is met, then demand is excused.  Brehm, 746
A.2d at 256.

        Because the second prong of the Aronson test applies to
the directors' exercise of their business judgment, it "has no
role where directors have either abdicated their functions, or
absent a conscious decision, failed to act."  Aronson, 473 A.2d
at 813.  Accordingly, where a derivative suit challenges, not a
conscious decision by directors, but a violation of the
directors' duty of oversight, only the disinterestedness and
independence of the board is at issue and a different test,
Rales, applies.  Under the Rales test, demand is excused as
futile if the plaintiff has alleged sufficient particularized
facts to create a reasonable doubt that "the board of directors
could have properly exercised its independent and disinterested
business judgment in responding to a demand."  Rales v. Blasband,
634 A.2d 927, 934 (Del. 1993).

Here, the plaintiff concedes that most of the director wrongdoing alleged in this suit concerns the directors' failure to exercise adequate oversight over the corporation's actions, The plaintiff concedes that, with respect to these allegations, the <u>Rales</u> test applies.  The only allegation to which the plaintiff contends that <u>Aronson</u> test applies is the directors' allegedly improper decision to authorize buybacks of NutriSystem stock.  <u>See</u> Pl. Opp. at 5-6.

In analyzing futility of demand, the Court will first examine the challenged stock buybacks under the second prong of <u>Aronson</u> to determine if the plaintiff has pled sufficient facts to create a reasonable doubt that the buybacks were the product of a valid exercise of business judgment.  The Court will then consider the sufficiency of the plaintiff's particularized pleading concerning the directors' alleged interestedness and lack of independence, as required to excuse demand under the <u>Rales</u> test and the first prong of the <u>Aronson</u> test.

B    The Stock Buybacks as a Valid Exercise of Business Judgment

The plaintiff contends that he has alleged sufficient facts to create a reasonable doubt that the directors' approval of NutriSystem's stock buybacks was a valid exercise of business judgment.  This would be sufficient to excuse demand under the second prong of the <u>Aronson</u> test.

The business judgment rule establishes a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Aronson, 473 A.2d at 812.  The burden is on the party challenging the directors' decision to establish facts that rebut the presumption.  Id.

For the business judgment rule to apply, directors must inform themselves prior to making a business decision of all the material information reasonably available to them and act with requisite care in discharging their duties.  The requisite standard of care requires only that a director not act with gross negligence or reckless disregard.  Id.   To apply the business judgment rule under the second prong of Aronson, a court must examine "the substantive nature of the challenged transaction" against "the factual background alleged in the complaint" and determine if the facts alleged create a reasonable doubt that the transaction was the result of a valid exercise of business judgment.  Pogostin v. Rice, 480 A.2d 619, 624-25 (Del. 1984), overruled in non-pertinent part by, Brehm, 746 A.2d 244.

Here, the plaintiff alleges that the directors committed waste by approving stock buyback programs in August 2006, February 2007, and October 2007.  The plaintiff alleges that these buybacks were authorized at a time when the price of NutriSystem's stock was "artificially inflated" and without

-22-

properly considering the competitive effects of Alli upon the NutriSystem's business.  Compl. ¶¶ 60-66, 75.  The plaintiff contends that when the buybacks were authorized, the directors knew or should have known that Alli was likely to be introduced to the market and that it would have a negative impact upon the company.  Id.  None of these allegations, however, is supported by particularized facts in the complaint showing that NutriSystem's stock price was artificially inflated at the time of the buybacks or that the directors knew or should have known of Alli's eventual impact.

The first stock buyback was authorized in August 2006, after Alli was recommended for approval by an FDA subcommittee but four months before it was formally approved.  The plaintiff offers only the bare assertion that NutriSystem's stock price was artificially inflated at this time.  The complaint identifies no allegedly false statement by NutriSystem that would have inflated the stock price, nor does the plaintiff identify any specific information that the directors allegedly failed to consider before authorizing the buyback.  The only information about Alli specifically mentioned in the complaint as available to the board at this time was the January 2006 FDA subcommittee recommendation, which was public information available to the market and presumably reflected in the market's valuation of NutriSystem's price.

The second stock buyback was authorized on February 14, 2007, one week after the FDA approved Alli for over-the-counter use, but four months before it went on the market on June 13, 2007.  The buyback was announced simultaneously with NutriSystem's announcement of its fourth quarter 2006 results and its earning guidance for the first quarter 2007 and full year 2007.  Although the complaint describes the February 14, 2007, press release in detail, it does not identify any specific statement in it as misleading or as artificially inflating NutriSystem's stock price.  The earning guidance contained in the February 14, 2007, press release was, in fact, not inflated and actually underestimated NutriSystem's earnings.[5]

Although the complaint alleges that the directors knew or should have known when they authorized the February 14, 2007, buyback that Alli would harm NutriSystem's business, the only specific information mentioned in the complaint as available to the directors at this time is the FDA's February 7, 2007, announcement that Alli had been approved for over-the-counter use and the November 28, 2006 statement at a NutriSystem-sponsored investor conference by Dr. Gary Foster that Alli could be a

---

[5]     The February 14, 2007, press release estimated that NutriSystem's first quarter 2007 revenue would be between $205 and $215 million and its full year 2007 revenue would be between $720 and $740 million.  Def. Ex. 2.  NutriSystem's actual first quarter 2007 revenue, announced April 25, 2007, was $238 million and its actual full year 2007 revenue, announced February 19, 2008, was $777 million.  Compl. ¶  48; Feb. 19, 2008 Form 8K Press Release, Def. Ex. 3.

blockbuster drug.  Neither of these pieces of information supports the allegation that the directors should have known of Alli's future impact on NutriSystem's sales.  Dr. Foster's prediction was equivocal; the plaintiff's own description of Foster's presentation quotes him as saying that, although Alli will likely be introduced to a "surge of interest," it might not be a "blockbuster" and that "the market would be able to tell pretty quickly, in the first three to six months," how successful Alli would be.  Compl. ¶¶ 44, 46.  The FDA's approval of Alli similarly gave no indication of how successful the drug would be. In addition, both Dr. Foster's statements, which are alleged to have been made at an investor's conference, and the FDA's approval of Alli were public information.  They were therefore part of the mix of information available to the market in setting the price of NutriSystem's stock and do not support the plaintiff's allegations that the February 2007 buyback authorization was made when the price was inflated.

The third buyback authorization at issue here was announced on October 3, 2007, four months after Alli's introduction to the market, in the same press release in which NutriSystem announced its disappointing preliminary third quarter 2007 results and its lowered earnings estimates for the remainder of 2007.  This authorization was therefore made simultaneously with NutriSystem's corrective disclosures concerning the negative impact of "shorter[-]term competitive pressures" from Alli.  The

plaintiff offers no facts from which to find that NutriSystem's stock price was artificially inflated despite these corrective disclosures.   The complaint alleges in conclusory terms that the October 3, 2007 buyout authorization was improper in the face of the company's announced "poor results" and "declining sales," but does not explain why such a decision was unreasonable, much less sufficiently grossly negligent or reckless to fall outside the business judgment rule.

In sum, the plaintiff has not alleged facts that suggest that any of the three board decisions to authorize buybacks of NutriSystem stock was not a valid exercise of the board's business judgment.   The first two buybacks were authorized before Alli was placed on the market and before the extent of its competitive impact on NutriSystem could be known, and the last buyback was authorized simultaneously with the company's corrective disclosures acknowledging the extent of Alli's competitive impact.   The plaintiff has therefore failed to establish demand futility with respect to these claims under the second prong of the <u>Aronson</u> test.[6]

---

[6]      Each of the board's authorizations of the stock buybacks falls outside the central focus of the plaintiff's claims:  the period between Alli's June 14, 2007, introduction to the market and NutriSystem's October 3, 2007, corrective disclosures.  To the extent that the complaint could be construed as arguing that the NutriSystem board should have acted in this June 2007 to October 2007 period to stop or rescind the purchase of stock that had been previously authorized on February 14, 2007, such a claim would concern an alleged failure by the board to act.  As such, demand futility for such a claim would not be analyzed under the <u>Aronson</u> test or implicate the business

C    The Disinterestedness and Independence of the
     NutriSystem Board

Both the Rales test and the first prong of the

Aronson test require the Court to determine if the plaintiff has

alleged sufficient facts with particularity to create a

reasonable doubt that a majority of NutriSystem's board of

directors was both disinterested and independent at the time this

suit was filed.  Rales, 634 A.2d at 934; Aronson, 473 A.2d at

814; see also Guttman v. Huang, 823 A.2d 492, 500 (Del. Ch. Ct.

2003) (noting that, in application, the two tests often "point[ ]

the court to a similar analysis").

Directors are "independent" when their decisions are

"'based on the corporate merits of the subject before the board,

rather than extraneous considerations or influences.'"  Rales,

634 A.2d at 936 (quoting Aronson, 473 A.2d at 816).  Lack of

independence is usually established by showing that a director

was dominated or otherwise controlled by an individual or entity

interested in the transaction.  See Rales, 634 A.2d at 936;

Pogostin, 480 A.2d at 624; Grobow v. Perot, 539 A.2d 180, 189

(Del. 1988), overruled in non-pertinent part by, Brehm, 746 A.2d

244; Aronson, 473 A.2d at 816.  The plaintiff contends here that

defendant director and CEO Hagan lacks independence because he

receives substantial monetary compensation from his employment at

NutriSystem and is therefore beholden to director defendants

judgment rule, but would instead be analyzed under Rales test for
board disinterestedness and independence, discussed below.

-27-

DiPiano and Tierney who sit on the compensation committee that sets his salary and bonus.

Directors are "interested" in a transaction "whenever divided loyalties are present, or a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders." Pogostin, 480 A.2d at 624; see also Rales, 634 A.2d at 936; Aronson, 473 A.2d at 812.  Directors are also interested when a corporate decision will have a materially detrimental impact on the director, but not on the corporation and the stockholders.  Rales 634 A.2d at 936.  One example of such an interest is when a director faces a "substantial likelihood" of personal liability from the plaintiff's claims. Wood, 953 A.2d at 140-141; Rales, 634 A.2d at 936; Aronson, 473 A.2d at 815.

The plaintiff contends that three directors, Hagan, Berg, and Tierney, are interested because they sold personally-held shares of NutriSystem at a time when they possessed materially adverse non-public information about the company and were authorizing it to buyback its shares.  The plaintiff also contends that all of the directors are interested because they face a substantial likelihood of liability for the securities violations and state law torts alleged in the derivative complaint.

-28-

1   Director Hagan's Independence as an Employee of
the Company

In 2006, CEO Hagan earned a salary of $165,000, a bonus
of $295,000 and a stock options of $37,772, for a total
compensation of $497,772.  Compl. ¶ 78.  The plaintiff contends
that Hagan's substantial monetary benefit from being
NutriSystem's CEO means that he lacks independence from defendant
directors DiPiano and Tierney, who serve on the committee that
approves Hagan's compensation.

Under Delaware law, merely being employed by a
corporation is not, by itself, sufficient to create a reasonable
doubt as to the independence of a director.  In re Walt Disney
Co. Deriv. Litig., 731 A.2d 342, 356 (Del Ch. Ct. 1998), aff'd in
pertinent part, Brehm v. Eisner, 746 A.2d 244 (Del. 2000).[7]  The
fact that a director earns his livelihood as an employee of the
company on whose board he serves is, however, relevant to
determining whether that director is independent.  In numerous
cases involving challenges to allegedly self-dealing transactions
between corporations and those who effectively control them,
Delaware courts have found that directors who are corporate
employees lack independence because of their substantial interest
in retaining their employment.  See, e.g., Rales, 634 A.2d at

_____

[7]     Brehm affirmed the finding of the Delaware Chancery
Court in Walt Disney that demand was not excused, but did so by
finding that the directors were not interested in the transaction
at issue and did not reach the issue of the directors'
independence.  Brehm, 746 A.2d at 258.

936-37; <u>Beam v. Stewart</u>, 833 A.2d 961, 977-78 (Del. Ch. Ct.
2003); <u>In re Student Loan Corp. Deriv. Litig.</u>, 2002 WL 75479
(Del. Ch. Ct. Jan. 8, 2002); <u>Mitzel v. Connelly</u>, 1999 WL 550369
(Del. Ch. Ct. July 22, 1999).

In <u>Rales</u>, a derivative suit challenged a corporate
decision to invest in junk bonds.  The court found that three
directors on the company's eight-member board were interested in
the challenged transaction.  Two of these directors together
owned 44% of the company's shares.  Based on these directors'
stock ownership and consequent ability to exert influence over
the corporation, the <u>Rales</u> court found that the company's CEO,
who was also a director, lacked independence because he had a
"substantial financial stake in maintaining his current offices"
and his $1 million a year salary.  <u>Rales</u>, 634 A.2d at 937.

In <u>Beam</u>, the plaintiff in a derivative action
challenged several actions by a corporation's CEO and majority
shareholder.  The court found that a director of the corporation
who was also employed as the corporation's President and COO for
yearly compensation of $980,000 lacked independence from the CEO
because of her "material interest in her own continued
employment."  <u>Id.</u>, 833 A.2d at 978.  The CEO's ability to affect
the director's employment and compensation created a reasonable
doubt as to whether the employee-director could "evaluate and
respond to a demand . . . without being influenced by improper

consideration of the extraneous matter of how pursuit of the claim would affect" the interests of the CEO.   Id.

This case differs from Rales, Beam, and similar cases because NutriSystem has no majority or plurality shareholder who can exercise control over CEO Hagan's continued employment.   The plaintiff here alleges only that directors DiPiano and Tierney have approval over CEO Hagan's compensation.   CEO Hagan, therefore, unlike the directors in Rales and Beam, is not alleged to face any risk that he might be fired from the company and lose his livelihood, only that his compensation might conceivably be reduced.

The plaintiff has cited no decision in which the control exercised over an officer-director's compensation by a committee of outside directors was sufficient to create a reasonable doubt about that director's independence.   Because the level of influence the members of a compensation committee can exercise over an officer-director is limited and does not threaten the officer-director's continued employment, the Court finds that the mere existence of such a committee, absent more particularized factual allegations of undue influence, is not enough by itself to create a reasonable doubt about an officer-director's independence.   The plaintiff here has therefore failed to establish that CEO Hagan lacked the independence to consider a demand.

2    The Disinterestedness of the Directors Accused of
Making Insider Sales of NutriSystem Shares

The plaintiff argues that directors Hagan, Berg, and
Tierney are interested in the outcome of this lawsuit because
they sold NutriSystem shares in the period immediately before or
after the introduction of Alli to the market.  The complaint
alleges that these directors knew that NutriSystem was making
misleading and incorrect statements about the competitive impact
of Alli and that the directors took advantage of this undisclosed
material adverse information by selling stock while NutriSystem's
price was inflated by the misstatements.  Compl. ¶ 67.  The
plaintiff alleges that these three directors consequently face a
substantial likelihood of being found liable for breaching their
fiduciary duties by participating in insider trading.  Compl.
¶¶ 76, 99-103.

Delaware law recognizes a cause of action for breach of
fiduciary duty when a director trades shares of a company,
motivated in whole or in part by material non-public information
about the company in the director's possession.  In re Oracle
Corp. Deriv. Litig., 867 A.2d 904, 933-344 (Del. Ch. Ct. 2004)
(citing Brophy v. Cities Service Co., 70 A.2d 5 (Del. Ch. Ct.
1949)), aff'd, 872 A.2d 960 (Del. 2005).  For allegations of
insider trading to create a reasonable doubt as to whether a
director is disinterested, there must be more than merely cursory
allegations of sales made at a time when the director alleged

possessed material, non-public information.  Guttman, 823 A.2d at 502.  A plaintiff must allege facts that show a substantial likelihood that a director will be liable for engaging in "material trading activity at a time when (one can infer from particularized pled facts that) [he or she] knew material, non-public information about the company's financial condition." Id.  Specific facts must be plead to support the allegations that specific material non-public information existed; that the accused directors possessed that information; and that those directors were trading because of that information.  Id. at 503-04.

In Guttman, the Delaware Chancery Court found that a plaintiff had failed to plead sufficient facts to show a substantial likelihood of liability for insider trading where no facts were pled concerning what role the allegedly insider-trading directors played at the company or what information they had access to in those roles, and where the alleged pattern of the directors' trades failed to support an inference of insider trading.  Id.  The Guttman court found that the fact that two of the challenged directors had sold all or half their stock holdings during the relevant period did not support a finding of likely liability, given the lack of any factual allegations showing that the directors had reason to know that the stock was inflated at the time of the sale.  Id. at 504; see also Rattner v. Bidzos, 2003 WL 22284323 at *12 (Del. Ch. Ct. September 30,

2003) (finding that the plaintiff had failed to allege sufficient facts to show whether an allegedly suspicious pattern of trades was "the product of an orchestrated scheme to defraud the market and the Company's shareholders or good faith adherence to Company policy or consistent with prior individual practices").

Here, the plaintiff has failed to meet his burden of showing a substantial likelihood of liability for insider trading on the part of Hagen, Berg, or Tierney.  The plaintiff has failed to allege specific facts to support the allegation that these directors possessed material non-public information at the time they made their trades.  The plaintiff has also failed to show that the pattern of these directors' trades supports the allegation that they were made for the purpose of taking advantage of inside information.

The complaint alleges that director and CEO Hagan sold $1,855,793.50 in NutriSystem shares on June 1, 2007, and $2,164,569 in shares on June 4, 2007; that director Tierney sold $987,362.64 worth of shares on June 8, 2007; and that director Berg sold $1,127,840 of NutriSystem shares on July 2, 2007. Hagan and Tierney's sales took place a week to a week and a half before Alli went on the market on June 13, 2007, and Berg's sales took place two and a half weeks afterwards.

The plaintiff has not alleged with particularity what material adverse non-public information Hagan and Tierney possessed when they made their trades before Alli entered the

market.  The plaintiff has alleged generally that all of
NutriSystem's directors knew or should have known of the
"significant negative impact that the weight loss pill [Alli]
would have on the Company" (Compl. ¶ 65), but has not identified
any particular information known to the directors (or to
NutriSystem generally) before Alli was placed on the market that
was not also known to the general public.  The only pre-release
information about Alli discussed in the complaint comes from news
reports, FDA announcements, or the comments of Dr. Gary Foster at
a November 28, 2006 NutriSystem-sponsored investor conference,
all of which were available to the public.  Compl. ¶¶ 36-40, 44-
46.  Although several of these public statements predicted that
Alli might be very successful, nothing in them supports an
allegation that Hagan and Tierney, or any other director,
possessed material non-public information about the competitive
impact of Alli before that drug was actually launched on the
market.

        The alleged insider sale by director Berg occurred a
little over two weeks after Alli was placed on the market.  It is
at least theoretically possible that during those two weeks some
NutriSystem employees might have had some internal, non-public
information about the competitive impact Alli was having on the
company's sales.  The plaintiff, however, does not specifically
plead that such information existed, or plead facts to show how
such information, even if it existed, would have been known to

Berg, an outside director.  In the absence of any such
allegations, the plaintiff has not pled sufficient facts to show
a substantial likelihood that Berg could be liable for insider
trading.  See Guttman, 823 A.2d 503-04.[8]

The plaintiff's allegations also fail to show that the
pattern of Hagan, Berg, and Tierney's trades supports an
inference of the necessary scienter required to state a claim for
insider trading.  The plaintiff has not alleged that the
challenged sales by Hagan, Berg, and Tierney involved a
significant portion of their holdings, or that their sales were
inconsistent with their prior trading activity.[9]  The defendant

---

[8]    The plaintiff contends that the potential competitive
impact of Alli was sufficiently important to NutriSystem that
directors and officers should be presumed to have knowledge of it
because it was part of NutriSystem's core business.  In re
Biopure Corp. Deriv. Litig., 424 F. Supp. 2d 305, 308 (D. Mass.
2006) (imputing knowledge about core business); In re Forest
Labs., Inc. Deriv. Litig., 450 F. Supp.2d 379, 390, 393 (S.D.N.Y.
2006) (same).  The plaintiff's argument confuses the difference
between fact and prediction.  The fact that Alli had been
approved by the FDA in February 2007 and would go on the market
in June 2007 was arguably sufficiently important to NutriSystem's
"core" business that knowledge of it should be imputed to the
directors.  Similarly, the fact that Alli could potentially
impact on NutriSystem's sales might also be imputed to the
directors.  In contrast, knowledge of exactly how successful Alli
would be or what competitive impact it would have on
NutriSystem's sales is not a "fact" that could be known before it
occurred.

[9]    The defendants have attached to their opposition public
filings by these directors, which the defendants contend show
that Hagan retained 96% of his shares Tierney retained 82% of his
shares after their challenged sales.  Def. Ex. 13, 14.  The Court
can take judicial notice of these public filings.  Oran v.
Stafford, 226 F.3d 275. 289 (3d Cir. 2000) (holding courts may
take judicial notice of properly authenticated public disclosure
documents filed with the SEC).  The information in those filings,

has produced public securities filings in which Berg and Hagan state that their challenged sales were made pursuant to Rule 10b5-1 plans.[10]  Def. Ex. 12, 13.  Sales made through such pre-approved plans counter any inference that the trades were made on the basis of insider knowledge.[11]

_____

however, is not sufficiently clear for the Court to be certain of exactly what percentage of Hagan's and Tierney's holdings these sales represent, although it is clear that they retained significant amount of NutriSystem stock.  The Court also notes that the defendants have not provided information as to the percentage of Berg's holdings that were sold.  Although the Court will not rely on the defendants' factual assertions concerning the exact percentage of Hagan's and Tierney's holdings involved in the challenged sales, this does not affect the Court's conclusion that the plaintiff has failed to plead facts suggesting the directors acted with scienter in making the alleged insider trades.

[10]   A 10b5-1 plan is a written plan for trading securities that complies with the requirements of 17 C.F.R. § 240.10b5-1(c)(1)(i)(A).  Under that regulation, a 10b5-1 plan acts as an affirmative defense to charges of insider trading and establishes that a purchase or sale of securities pursuant to the plan is not made on the basis of material non-public information.  The requirements of a 10b5-1 plan include that trading be made according to a pre-existing plan or algorithm or that the person instituting the plan retain no subsequent influence over how, when, or whether to trade.

[11]   The plaintiff correctly notes that a 10b5-1 plan is not a defense to insider trading charges unless the plan was adopted before the defendant learned of material non-public information.  See 17 C.F.R. § 240.10b5-1(c)(1)(i)(A).  The plaintiff suggests that whether Hagan and Berg's plans were adopted at a time when they knew of material non-public information is an issue of fact that cannot be resolved in a motion to dismiss and that the Court should therefore not take judicial notice of the plans.  The Court finds that it can take judicial notice of the public filings showing that the challenged sales by Hagan and Berg were made pursuant to 10b5-1 plans.  Oran, 226 F.3d at 289.  Although the Court has no information before it as to when these plans were adopted, as discussed above, the plaintiff has failed to plead facts showing that Hagan or Berg possessed material non-public information prior to their challenged sales of NutriSystem

The Court concludes that the plaintiff's allegations are insufficient to find that directors Hagan, Berg, or Tierney face a substantial likelihood of personal liability for breaching their fiduciary duties by trading on material non-public information.  Neither Hagan, Berg, nor Tierney can be found to be "interested" on this basis for purposes of excusing the plaintiff's failure to make a demand on the board.

### 3   The Disinterestedness of the Directors Who Face Personal Liability from the Plaintiff's Claims

The plaintiff contends that none of the director defendants can be considered "disinterested" in this litigation because each one faces a substantial likelihood of personal liability from the plaintiff's claims of securities violations, breach of fiduciary duty, unjust enrichment, and waste.

Merely naming directors as defendants in a derivative suit is not sufficient to make them interested parties and excuse demand under Delaware law.  To establish that a demand would be futile, a plaintiff must plead particularized facts showing a "substantial likelihood" that a majority of the board of directors will face personal liability. Rales, 634 A.2d at 936; Aronson, 473 A.2d at 815.

---

stock.  The plaintiff has therefore failed to plead any facts suggesting that the 10b5-1 plans were adopted at a time when Hagan or Berg possessed such information.

In arguing that the plaintiff has not shown a "substantial likelihood" of liability, the defendants address only the potential liability of the six outside director defendants and do not address the liability of defendant CEO and director Hagan.  Because the NutriSystem board at the relevant time consisted of Hagan, the six outside director defendants, and non-defendant director Devine, it is not necessary to evaluate Hagan's potential liability to determine whether a demand would be futile.  Even assuming for purposes of this motion that Hagan faces a substantial risk of liability, the plaintiff would have to make a similar showing as to four of the outside directors to establish that a majority of the board would be unable to disinterestedly consider a demand.  The Court will accordingly analyze only the potential liability of the outside directors.

a.   <u>Federal Securities Claims</u>

The plaintiff's complaint brings federal securities claims against all defendants for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.[12]  The outside director defendants are alleged to have violated these laws by "disseminat[ing] or approv[ing]" public statements that

---

[12]   The complaint also brings claims against all defendants for violations of Section 20(a) of the Securities Exchange Act. Because a Section 20(a) claim depends upon the existence of liability under Section 10(b), the Court will not analyze the directors' Section 20(a) liability separately.

"improperly portrayed . . . NutriSystem's business prospects, growth, and margins."  Compl. ¶ 83.

The elements of a 10b claim are:  (1) a material misrepresentation or omission; (2) scienter – the defendant's intent to deceive, manipulate, or defraud; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 341-42, 125 S. Ct. 1627 (2005).  These elements are subject to the heightened pleading burden imposed by both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.  <u>In re Rockefeller Ctr. Props., Inc. Sec. Litig.</u>, 311 F.3d 198, 217 (3d Cir. 2002).

To adequately plead the element of scienter under the PSLRA, a plaintiff must identify each statement alleged to have been misleading, specify the reasons why it is misleading, and state with particularity the facts that give rise to a strong inference that the defendant acted with the required state of mind.  <u>Tellabs v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 127 S. Ct. 2499, 2507-08 (2007); <u>Winer Family Trust v. Queen</u>, 503 F.3d 319, 326 (3d Cir. 2007).  To be sufficiently "strong," an inference of scienter must be cogent and at least as compelling as any competing nonculpable inference plausibly drawn from the facts alleged and taken as a whole.  <u>Tellabs</u>, 551 U.S. at 2509;

<u>Institutional Investors Group v. Avaya, Inc.</u>, 564 F.3d 242 (3d Cir. 2009).

Here, the plaintiff's complaint fails to satisfy these requirements.  The complaint fails to identify with specificity the particular statements alleged to be misleading and the particular defendant or defendants responsible for making them, and it fails to allege facts giving rise to a strong inference of scienter.

(1)   <u>Statements Alleged to be Misleading</u>

The complaint describes NutriSystem's press releases and analyst conference calls that occurred from February 14, 2007, through February 17, 2008.  Compl. ¶¶ 47-53.  Paragraph 54 of the complaint then generally alleges that these statements were improper because they "failed to disclose and misrepresented the following adverse facts" which the defendants "either knew, consciously disregarded, or were reckless and grossly negligent in not knowing and should have known."  These adverse facts are:

> a) that the Company was signing up materially fewer new customers and was not performing according to internal expectations;
>
> b) that the Company's costs of acquiring new customers were significantly increasing;
>
> c) that the Company's performance, including the number of new customers, was being negatively impacted by competition from other weight loss products on the market; and

> d) as a result of the foregoing, NutriSystem
> was not experiencing solid growth and
> improving margins.

Compl. ¶ 54.  Elsewhere in the complaint, the plaintiff alleges

that the material non-public information that the defendants

failed to disclose includes unspecified and undated "internal

analyses at NutriSystem showing that the Company faced increased

competition that was causing NutriSystem's marketing to be less

efficient and was having an adverse impact on its results of

operations."  Compl. ¶ 43.

These general allegations are insufficient to identify

the specific misstatements at issue, as required by Rule 9(b) and

the PSLRA.  None of the allegedly non-disclosed adverse facts

identified in the complaint relate to NutriSystem statements made

either before Alli was introduced on the market on June 13, 2007,

or after NutriSystem issued its corrective disclosures on October

3, 2007.  All of the allegedly non-disclosed facts concern the

actual, not predicted, impact of Alli on NutriSystem's sales.

These facts, therefore, were not known until after Alli went on

the market and could not have been omitted from NutriSystem

statements made before June 13, 2007.

The substance of these allegedly omitted facts -- that

competition was causing NutriSystem to sign up fewer customers

and to experience increasing customer acquisition costs, which

hurt the company's performance and growth prospects -- was

disclosed in NutriSystem's press release of October 3, 2007.  The

-42-

October 3 press release announced lower-than-estimated
preliminary third quarter results and lowered earning estimates
for the rest of the year and quoted CEO Hagan as saying that:

> our performance with new customers we believe
> was affected by shorter-term competitive
> pressures which caused our marketing dollars
> to be less efficient, resulting in fewer new
> Direct Business customers than anticipated
> and customer acquisition costs to be higher
> than anticipated.

Def. Ex. 7.  The plaintiff's allegations of non-disclosure
therefore do not relate to NutriSystem's statements on or after
October 3, 2007, because on that date the allegedly omitted
information was disclosed.

The only NutriSystem statements to which the
complaint's alleged adverse non-disclosed facts could relate are
statements made between June 13 and October 3, 2007.  The
complaint identifies only two such statements, a NutriSystem
press release and an analyst conference call, both of which
occurred on July 24, 2007.  The July 24 press release disclosed
NutriSystem's second quarter results and issued increased
earnings estimates for the third quarter and full-year 2007.  At
least in part, these NutriSystem statements do appear to disclose
some of the allegedly non-disclosed facts pled in the complaint.
The complaint alleges that NutriSystem failed to disclose that
the company's "performance, including the number of new
customers, was being negatively impacted by competition" from
other weight loss products.  In the July 24 analyst call, CEO

Hagan is quoted, in response to a question about the impact of Alli, as saying the company saw "some slight softening of demand" in the second half of June and "not so coincidentally" that this might be related to Alli's introduction, although the company believed this reduction in demand was temporary.

### (2)  Responsibility for Misleading Statements

Even if the plaintiff sufficiently identified the allegedly non-disclosed adverse facts omitted from the July 24, 2007, statements, the plaintiff has not sufficiently pled facts that would impose responsibility for those statements on the outside directors.  The complaint does not allege that any of the outside directors actually made any of the statements in the July 24, 2007, press release or conference call (or made any other statement referenced in the complaint).  Instead, the complaint only alleges generally that the outside director defendants, together with the management defendants, either "caused or allowed" the company to make statements (Compl. ¶¶ 47-49, 54) or "disseminated or approved public statements" (Compl. ¶ 83) that contained omissions of material facts.

These general allegations are insufficient to meet the heightened pleading requirements of the PSLRA.  Winer Family Trust, 503 F.3d at 334-37.  Winer held that the PSLRA requires that a plaintiff's complaint "specify the role of each defendant, demonstrating each defendant's involvement in misstatements and

omissions." Id. at 335.  In so holding, Winer found that the PSLRA had abolished the prior "group pleading" doctrine, which had allowed plaintiffs the benefit of a presumption that "statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations," and which made it unnecessary for a plaintiff to plead a specific connection between the defendants and the allegedly misleading statements in such documents.  Id. at 335, 337.

The plaintiff has attempted to satisfy the PSLRA by singling out the four outside directors on the audit committee of the board of directors.  The complaint quotes the audit committee's charter as authorizing its members, among other things to "discuss with management and the independent auditor . . . earnings press releases and financial information and earnings guidance provided to the public" and to "assist the board in its oversight of the integrity of the financial statements of the company" and the company's "compliance with legal and regulatory requirements."  Compl. ¶ 77.  The complaint contends that the members of the audit committee were therefore "responsible for directly participating in the dissemination and ensuring the accuracy of [sic] NutriSystem's earnings press releases and guidance."

These allegations concerning the members of the audit committee are exactly the type of group pleading rejected by Winer and the PSLRA.  In Winer, the plaintiff attempted to assert liability over certain defendants on the basis of their "access to, control over, and ability to edit and withhold dissemination of [the company's] press releases and SEC filings."  Id. at 334-35.  The Winer court described those allegations as "group pleading" and held that they failed to state a claim under the requirements of the PSLRA.  Under Winer, the plaintiff's allegations in this case that the audit committee had general oversight over NutriSystem's disclosures are not enough to satisfy the PSLRA and plead a viable 10b-5 claim.

### (3)   Allegations of Scienter

For the outside directors to face a substantial risk of liability for 10b-5 violations, the plaintiff must establish that the directors acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud."  Tellabs, 551 U.S. at 319 (internal quotation and citation omitted).  Scienter can also be established by recklessness, constituting behavior that is "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  Institutional Investors, 564 F.3d at 267 n.42

(internal quotation and citation omitted).  For scienter to be adequately pled, the plaintiff must allege particularized facts that, taken as true and considered collectively, allow an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs at 324; Institutional Investors at 277-79.

The plaintiff argues that the complaint adequately alleges scienter because it alleges that the outside directors knew that competition from Alli was going to hurt NutriSystem's business, but nonetheless recklessly allowed the company to make misleading statements about the company's prospects and falsely reassured the market by authorizing a stock buyback the month after Alli was approved for over-the-counter use by the FDA.  The plaintiff also alleges that, as to outside directors Berg and Tierney, the complaint adequately alleges scienter on the basis of their insider trading.

Viewed as a whole, these allegations fail to establish an inference of scienter.  By the plaintiff's own admission, his allegations that the outside directors knew that Alli was going to negatively impact the company are based on the "extensive public knowledge of Alli's progression to FDA approval" and the presentation given by Dr. Gary Foster at a NutriSystem-sponsored investor conference.  Pl. Opp. at 22.  This public information was equally available to the market as a whole and does not support an inference that the outside directors knew material

-47-

non-public information that they deliberately failed to disclose.
The plaintiff's allegations of insider trading also fail to show
scienter.  As discussed previously, the allegedly insider sale by
director Tierney occurred before Alli went on the market and
before any competitive impact from its competition could be
known, and the sale by director Berg, which occurred after Alli
went on the market, was made pursuant to a 10b5-1 plan.

         The plaintiff has cited several decisions to support an
inference of scienter here, but these decisions only illuminate
the deficiencies in the plaintiff's showing.  In Novak v. Kasaks,
a plaintiff alleged that a company kept out-of-date merchandise
on its books at inflated values and kept track of this
merchandise through a secret separate inventory.  216 F.3d 300
(2d Cir. 2000).  The Novak court found that the plaintiff had
adequately pled a strong inference of scienter on the part of the
company's management where the plaintiff alleged that the
management defendants participated in weekly meetings in which
the separate inventory was distributed and alleged that the
defendants discussed publicly disclosing this separate inventory,
but declined to do so, and instead put out false reassurances
that the company's inventory was properly valued and not growing
unduly.  Id., 216 F.3d at 304, 311-12.

         Novak does not support finding a strong inference of
scienter here against the outside directors.  Novak involved
claims against management, not directors, and contained far more

detailed allegations of wrongdoing than the plaintiff has advanced in this case.  The plaintiff here, unlike the Novak plaintiff, has alleged no meetings among the defendants at which the allegedly non-disclosed information was discussed nor alleged active discussions by the defendants about whether to reveal that information.

The plaintiff also relies on In re Countrywide Fin. Corp. Deriv. Litig., 554 F. Supp.2d 1044 (C.D. Cal. 2008).  In Countrywide, the plaintiff, based on statements by confidential witnesses, alleged that over a five-year period a finance company increased its proportion of risky loans, violated its own underwriting standards, and failed to adequately hedge its risks and that these activities created numerous "red flags" known to the directors, including unexplained changes to the company's balance sheet.  Id. at 1050-53.  The Countrywide court found the plaintiff had alleged red flags of such sufficient prominence and magnitude that the defendants "must necessarily have examined and considered them" in performing their oversight duties.  Id. at 1060.  The court specifically found that a strong inference of scienter had been raised against outside directors because the alleged red flags implicated underwriting practices at the core of the company's business model, which the directors in their oversight capacity were required to know.  Id. at 1064.

None of the allegations in this case approaches those in Countrywide.  This case does not involve a years-long pattern

of misconduct.  As discussed previously, the alleged non-disclosures here involve the impact from Alli in the three and a half month period between the drug's June 13, 2007, introduction to the market and NutriSystem's October 3, 2007, corrective disclosure.  Unlike the <u>Countrywide</u> plaintiff, the plaintiff here has not alleged specific red-flags existing over a period of time, such as a deteriorating balance sheet, of which the directors would necessarily known, nor has he substantiated his allegations of misconduct with information from confidential informants.

Even if the plaintiff had pled sufficient allegations to establish an inference of scienter on the part of the outside directors, that inference would not be stronger than competing inferences of non-culpable conduct.  Viewed as a whole, the most plausible inference from the allegations of the complaint is that all of the defendants were aware, prior to Alli's introduction to the market, that Alli could negatively impact NutriSystem's performance, but that they believed any effect on NutriSystem sales and financial performance would be short-lived as customers experienced unpleasant side effects and discontinued using Alli.  Such a belief was explicitly stated by CEO Hagan at the July 24, 2007, analyst conference call.  CEO Hagan acknowledged "slight softness in demand in late June and carrying into early July" which he attributed to the "launch of a new over-the-counter weight loss pill with significant PR and media behind it," but

stated his belief that the effect would be "temporary" as "consumers [of Alli] either don't lose the weight or not fast enough or don't like the side effects."  Def. Ex. 6 at 2, 7.  As the company continued to experience negative effects from Alli's competition, the company disclosed that information to the market on October 3, 2007, in its preliminary announcement of its disappointing third quarter results.  In sum, the plaintiff's allegations more plausibly suggest that NutriSystem's management and directors, at most, negligently misjudged Alli's impact, rather than that they knowingly failed to disclose it.

Because the plaintiff has failed to adequately allege the elements of a 10b-5 claim against the outside directors, those directors are not subject to a substantial risk of liability for such a claim.  Accordingly, the plaintiff has failed to raise, on this basis, a reasonable doubt as to the outside directors' disinterestedness that would excuse making a demand on the board.

b.   State Law Claims

The plaintiff also seeks to excuse demand on the ground that the directors face a substantial risk of liability from the state law claims in the complaint for breach of fiduciary duty, unjust enrichment, and waste.

The plaintiff alleges that the defendants breached their fiduciary duties by authorizing the company to buyback its

-51-

stock at allegedly inflated prices, by trading on insider information, and by causing the company to issue misleading public financial guidance.  Compl. ¶¶ 94-97, 100-104.  The Court has already addressed whether the allegations concerning the stock buybacks and alleged insider trading create a substantial risk of liability for the outside directors, and has addressed the directors' liability for allegedly misleading statements in its discussion of the plaintiff's federal securities claims.  For the reasons discussed earlier in this memorandum, the outside directors do not face a substantial risk of liability for these claims.

        The plaintiff also alleges that the defendants breached their fiduciary duties by their "failure to perform their fiduciary obligations."  Compl. ¶ 97.  This type of claim, alleging that the directors breached their fiduciary duties of good faith and loyalty by failing to monitor corporate performance, was recognized <u>In re Caremark Int'l Deriv. Litig.</u>, 698 A.2d 959, 968-70 (Del. Ch. Ct. 1996).

        <u>Caremark</u>, although recognizing the claim, described it as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," requiring proof of a "sustained or systematic failure of the board to exercise oversight . . . [such as] an utter failure to attempt to assure a reasonable information and reporting system exists."  <u>Id.</u> at 967, 971.  To plead such a claim, a plaintiff must allege facts

showing the lack of oversight, such as "that the company lacked an audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation." Guttman, 823 A.2d at 507. Here, the plaintiff has alleged no particularized facts to show a systemic failure of oversight at NutriSystem, and the outside directors therefore do not face a substantial risk of liability on the plaintiff's Caremark claim.[13]

---

[13]    NutriSystem's corporate charter contains an exculpatory clause that provides that directors shall not be personally liable to shareholders or to the corporation for breach of fiduciary duty, except for breaches involving the duty of loyalty or the duty of good faith or for transactions for which the director received an improper personal benefit. Def. Ex. 10, Art. 6. Under Delaware law, such exculpatory clauses can be considered in assessing whether a defendant faces a substantial risk of liability for purposes of evaluating demand futility. Guttman, 823 A.2d at 501. The defendants contend that this clause bars all the plaintiff's claims for breach of fiduciary duty. Def. Rep. Br. at 16. The Court disagrees. By its terms the exculpatory clause does not apply to breaches of the duty of good faith or loyalty or to self-dealing. The clause therefore cannot apply to the alleged breach of fiduciary duty by directors Hagan, Berg, and Tierney from their alleged insider trading. The clause also cannot apply to the plaintiff's Caremark claims, which are considered claims for breach of the duties of the duties of good faith and loyalty. The clause does apply, however, to the plaintiff's breach of fiduciary duty claims relating to the authorization of the stock buyback program and to the issuance of allegedly improper financial guidance with respect to the four directors against whom there is no allegation of insider trading: Bernstock, DiPiano, Musser, and Zarilli. As to these breach of fiduciary claims against these four defendants, the exculpatory clause provides another basis for finding no substantial basis for liability.

The plaintiff's unjust enrichment claim alleges only that on the basis of the defendants' unspecified "wrongful acts and omissions," the defendants "were unjustly enriched" at NutriSystem's defense.  Compl. ¶ 109.  To the extent that this vague allegation adequately states a claim, it fails to suggest that any outside director would face a substantial likelihood of liability.  The complaint's allegations of insider trading might support a claim for unjust enrichment, but, as discussed earlier, these allegations are insufficient to show a substantial likelihood of liability on the part of the directors accused of such trading.

The plaintiff brings claims against the defendants for waste of corporate assets on the basis of their authorizing the stock buyback programs, failing to conduct adequate supervision, subjecting the corporation to liability for the defendants' actions (which required the corporation to incur legal fees), and paying unspecified bonuses to executive officers.  Compl. ¶¶ 104-05.  None of these allegations creates a substantial risk of liability for the outside directors.  The claims relating to the authorization of the stock buyback program have been discussed earlier, as have the Caremark claims for inadequate supervision.  The claims alleging that the defendants' actions subjected NutriSystem to liability fail because the plaintiff has failed to show a substantial risk of liability for any of the other claims alleged.  The reference in the waste claim to bonuses paid to

-54-

corporate officers is not supported by factual allegations elsewhere in the complaint,[14] or discussed in the plaintiff's opposition brief.  To the extent it states a claim, it fails to establish a substantial risk of liability.

III. <u>Conclusion</u>

The factual allegations in the plaintiff's complaint have failed to establish that a demand on the NutriSystem board would be futile.  The allegations of the complaint, taken as true, do not create a reasonable doubt as to whether the specific actions taken by the board are the product of the valid exercise of business judgment or whether the directors are disinterested and independent.  Accordingly, under either the <u>Aronson</u> or <u>Rales</u> tests, demand here is not excused, and the plaintiff's derivative complaint must be dismissed.

An appropriate Order will be entered separately.

---

[14]   The complaint describes the bonuses received by the four management defendants for 2006.  Compl. ¶¶ 11-14.  The complaint, however, says nothing about these defendants' bonuses for 2007, the year in which Alli was introduced and NutriSystem was forced to lower its forecast earnings.